**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KASSANDRA ROSADO and KREISAU GROUP
LLC,

                *Plaintiffs*,

     v.

PAMELA BONDI, in her official capacity as
Attorney General, and

KRISTI NOEM, in her official capacity as Secretary
of Homeland Security,

                *Defendants*.

Civil Action No.: 1:26-cv-01532

Hon. Jorge L. Alonso

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

      A.    Plaintiff Kassandra Rosado creates a Facebook group to help her community stay apprised of ICE operations in Chicago. ...................................... 2

      B.    Plaintiff Kreisau Group creates the "Eyes Up" app to store videos of ICE enforcement activity.................................................................................................. 4

      C.    Federal officials make a series of threats of criminal prosecution concerning online tools that share information about ICE enforcement. .................................. 4

      D.    Defendants coerce Apple to take down Eyes Up and similar apps......................... 5

      E.    Defendants coerce Facebook to disable the ICE Sightings – Chicagoland group. ...................................................................................................................... 6

ARGUMENT ............................................................................................................................ 7

I.    Plaintiffs are likely to succeed on their First Amendment claims because the government coerced Apple and Facebook into suppressing their protected speech........... 8

      A.    The First Amendment protects sharing information about public law enforcement activities. ........................................................................................... 8

      B.    The government violated the First Amendment by coercing Apple and Facebook into suppressing protected speech. ........................................................ 9

II.    Plaintiffs are suffering irreparable harm and the remaining factors favor granting relief. ..................................................................................................................................... 14

CONCLUSION.......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .................................................................................. 2, 8, 15

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ...................................................................................................... 8

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ............................................................................... passim

*BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*,
912 F.3d 1054 (7th Cir. 2019) .................................................................................... 15

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................................ 9, 10, 12

*Beal v. Beller*,
847 F.3d 897 (7th Cir. 2017). ....................................................................................... 2

*Butterworth v. Smith*,
494 U.S. 624 (1990) ...................................................................................................... 8

*Castañon Nava v. Dep't of Homeland Sec.*,
806 F. Supp. 3d 823 (N.D. Ill. 2025) ........................................................................... 3

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ...................................................................................... 15

*City of Houston v. Hill*,
482 U.S. 451 (1987) ...................................................................................................... 8

*Elrod v. Burns*,
427 U.S. 347 (1976) .................................................................................................... 15

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) ...................................................................................... 15

*Irizarry v. Yehia*,
38 F.4th 1282 (10th Cir. 2022) ..................................................................................... 8

*Landmark Commc'ns, Inc. v. Virginia*,
435 U.S. 829 (1978) ...................................................................................................... 8

*Moody v. Netchoice, LLC*,
603 U.S. 707 (2024) ...................................................................................................... 9

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................................................... 8

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ........................................................................................................... 2

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ................................................................................................... passim

*Reps. Comm. for Freedom of the Press v. Rokita*,
   147 F.4th 720 (7th Cir. 2025) ..................................................................................... 7, 8, 14

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   592 U.S. 14 (2020) ....................................................................................................... 14, 15

*Sharpe v. Winterville Police Dep't*,
   59 F.4th 674 (4th Cir. 2023) ............................................................................................... 9

## INTRODUCTION

As the federal government has ramped up immigration enforcement, Americans across the country have watched, discussed, and debated the tactics of U.S. Immigration and Customs Enforcement (ICE). Americans have seen masked agents grabbing people off the street, whisking them away in unmarked vehicles, smashing car windows, tear gassing and pepper spraying children, mistakenly arresting citizens, and shooting and killing citizens. *See, e.g.*, McDonell Decl. Exs. A–F, S–T. To stay informed about our government's actions, and to keep themselves and their communities safe, Americans have responded with speech, using various means to share information about ICE's activities and tactics.

Some, such as the plaintiffs in this action, have created apps or social media groups to exchange information and document what is happening in the streets of Chicago, Los Angeles, Minneapolis, and elsewhere in America. Plaintiff Kassandra Rosado created a Facebook page, "ICE Sightings – Chicagoland," so fellow Chicagoans could share information about ICE activities in public and stay safe by avoiding areas where ICE was operating. Plaintiff Kreisau Group LLC created an app—"Eyes Up"—to allow people across the country to upload and view videos of ICE activities and to ensure such evidence is preserved for efforts to hold our government accountable.

But Attorney General Pamela Bondi and Homeland Security Secretary Kristi Noem want to control what the public can see, hear, or say about ICE operations. Wielding the powers of the federal government, they coerced Facebook to disable Rosado's Facebook group and Apple to remove Kreisau Group's Eyes Up app. They were not subtle about it. Bondi and Noem publicly announced the government had demanded that Apple and Facebook remove apps and groups reporting on ICE activities, boasting that the platforms had complied with their demands.

1

This is blatantly unconstitutional under the First Amendment. As the Supreme Court held just two terms ago, "A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). She "cannot do indirectly what she is barred from doing directly." *Id.* But defendants did just that.

It is equally plain that the First Amendment protects rights to observe, record, and disseminate information about what law enforcement does in public. *See, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 586, 595–97 (7th Cir. 2012). This is true even when—and especially when—that information may be "embarrassing to the powers-that-be." *N.Y. Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Douglas, J., concurring). To protect the freedom to speak about the government without government interference, this Court should enjoin Bondi and Noem from coercing third parties to suppress plaintiffs' speech.

## STATEMENT OF FACTS

### A. Plaintiff Kassandra Rosado creates a Facebook group to help her community stay apprised of ICE operations in Chicago.

Plaintiff Kassandra Rosado was born and raised in Chicago. She founded and runs a small business in the Chicago Southland selling jewelry. She is active in her community—for example, working with other business owners to organize community events where they set up booths to sell their wares. Verified Complaint ("Compl.") ¶¶ 10, 24.[1]

After President Trump's inauguration in January 2025, and his administration's launch of expanded ICE raids in Chicago and other U.S. cities, Rosado saw that people in her community were anxious about these developments. Rosado—a U.S. citizen of Mexican descent—observed these fears were most pronounced among Chicagoans of Hispanic heritage. She talked with other

---

[1] A verified complaint is "the equivalent of an affidavit" for evidentiary purposes. *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017).

business owners about how attendance at public events had dropped sharply as fewer people ventured out. *Id.* ¶ 25; *see* McDonell Decl. Exs. M–O.

Rosado took action and created a Facebook group: "ICE Sightings – Chicagoland." The group started small, consisting mostly of fellow business owners, some friends, and family. She wanted to help people share information about where ICE was operating in Chicago and how it was affecting the community. Members would post locations where they had seen or heard about ICE activities in public, sometimes including photos or videos. Compl. ¶ 26.

The group remained small until September 2025, when ICE announced and launched an enforcement campaign in Chicago dubbed "Operation Midway Blitz." *Id.* ¶ 27; *see* McDonell Decl. Ex. R. As reports of ICE officers shooting Chicagoans inflamed the city, interest also surged in Rosado's Facebook group. Compl. ¶ 27; McDonell Decl. Exs. S–T. These violent encounters, along with reports of ICE officers detaining even citizens and lawful U.S. residents,[2] gave Chicagoans reason to fear being injured or arrested just for being in the vicinity of ICE raids no matter their immigration status. Compl. ¶ 27.

By October, membership in the Chicagoland Facebook group ballooned to nearly 100,000 members, with users publishing thousands of posts and comments per day. Members continued posting information about where ICE was operating, so they could stay safe by avoiding those areas, and photographs and videos of enforcement activity. Group members at times also voiced their opinions on ICE's tactics. *Id.* ¶ 28; *see, e.g.*, Rosado Decl. Exs. E–K.

Rosado and volunteer moderators she recruited instructed members not to post anything threatening, hateful, or that promoted violence or illegal conduct. Compl. ¶ 31; *see, e.g.*, Rosado

---

[2] *See, e.g.*, *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 851–52, 852 n.13 (N.D. Ill. 2025).

Decl. ¶¶ 3–5 & Exs. B, D. Out of thousands of posts and tens of thousands of comments members of the group created through October 2025, Facebook's own moderators removed only five as purportedly violating its guidelines. But Facebook advised Rosado these were "participant violations" that "don't hurt your group," explaining: "Groups aren't penalized when members or visitors break the rules without admin approval." Compl. ¶¶ 32–33; Rosado Decl. Exs. C1–C6.

### B. Plaintiff Kreisau Group creates the "Eyes Up" app to store videos of ICE enforcement activity.

Mark Hodges founded Kreisau Group LLC, a "technology-driven group focused on exposing injustice, defending human rights, and building resilient tools for people living under increasingly authoritarian systems." Part of that mission is to document and preserve evidence of governmental abuse of power. Hodges saw people posting videos online documenting ICE officers committing potential civil rights violations, and he wanted to ensure such videos remained available in the future for efforts to hold the government accountable. Compl. ¶¶ 34–35.

So he created Eyes Up, an online tool allowing users to record, securely store, and view these videos. Eyes Up arranges videos in a map interface based on geolocation data. But because Kreisau Group moderators manually review each video before it becomes publicly available, Eyes Up cannot be used to track any ICE officer's location or movement in real time. *Id.* ¶¶ 35–38.

Apple approved Eyes Up for inclusion on its App Store on August 27, 2025. *Id.* ¶ 39. Users have submitted hundreds of videos made publicly accessible and securely stored for future use. *Id.* ¶¶ 39–41; *see, e.g.*, Hodges Decl. Exs. G–I.

### C. Federal officials make a series of threats of criminal prosecution concerning online tools that share information about ICE enforcement.

In the summer of 2025, Department of Justice (DOJ) and Department of Homeland Security (DHS) officials began targeting online tools that shared information about where ICE was operating, casting aspersions of criminality and threats of prosecution toward anyone remotely

associated with such speech. On June 30, CNN interviewed the creator of ICEBlock, an iPhone app allowing users to share locations of ICE operations so they can avoid interacting with ICE. McDonell Decl. Ex. U. In response, ICE Acting Director Todd Lyons alleged the app was "inviting violence" against officers and accused CNN of "willfully endangering the lives of officers." *Id.* Ex. W; *see also id.* Ex. V. Border czar Tom Homan, when asked about CNN's reporting on the ICEBlock app, said "DOJ needs to look at this" and "send a strong message." *Id.* Ex. X.

DHS Secretary Noem, when asked to respond to Homan's call for prosecuting CNN, said: "We're working with the Department of Justice to see if we can prosecute them for that … and we're going to actually go after them and prosecute them with the partnership of Pam [Bondi] if we can because what they're doing, we believe, is illegal." *Id.* Ex. Y. When Attorney General Bondi was asked in a news interview whether creating an app warning of ICE officers in the area made you "guilty of obstruction" and "aiding and abetting," Bondi answered, "Yeah, and that's what he's doing," saying that DOJ was "looking at" the developer of ICEBlock and "he better watch out" because, she claimed, "that's not a [sic] protected speech." *Id.* Ex. Z, at 6:08.

### D.   Defendants coerce Apple to take down Eyes Up and similar apps.

On October 2 and 3, Apple removed several apps that shared information about locations of ICE operations, including the ICEBlock app, a similar app called Red Dot, and Eyes Up. Apple said it did so "[b]ased on information we've received from law enforcement." *Id.* Ex. AA.

While Apple's public statement seemed carefully worded, Attorney General Bondi was blunt in saying Apple removed the apps because DOJ demanded it. In a statement to Fox News on October 2, Bondi boasted: "We reached out to Apple today demanding they remove the ICEBlock app from their App Store — and Apple did so." *Id.* Ex. BB. In subsequent remarks, Bondi confirmed that DOJ made platforms remove ICE-related apps: "We had Apple and Google take down the ICEBlock apps," warning, "We're not going to stop at just arresting the violent criminals

we can see in the streets." *Id.* Ex. CC. Separately, conservative activist Laura Loomer reported that DOJ had demanded removal of the Red Dot app: "DOJ ordered Apple to delete the App from the App Store." *Id.* Ex. DD; *see also id.* Ex. EE (claiming access to a "DOJ source").

On October 3, 2025, Apple notified Kreisau Group that it removed the Eyes Up app, using the same careful phrasing it had used with others, *i.e.*, the takedown was based on "[i]nformation provided to Apple by law enforcement." Hodges Decl. Ex. B. In this communication, Apple now said the app violated guideline 1.1.1, which prohibits "Defamatory, discriminatory, or mean-spirited content, including references or commentary about religion, race, sexual orientation, gender, national/ethnic origin, or other targeted groups," *Id.* But Apple had reviewed and approved Kreisau Group's application for inclusion in the App Store just a month earlier. Eyes Up was then already accessible via a website, so Apple had full knowledge of its content—and it raised no questions about guideline 1.1.1. Compl. ¶¶ 57–58; Hodges Decl. Exs. A1–A2. It is unclear how publicly sharing information about public ICE activities could constitute "[d]efamatory, discriminatory or mean-spirited content," and Apple said nothing of this sort until after it was contacted by government officials. Compl. ¶¶ 57–58; *see* Hodges Decl. Exs. A1–B.

### E. Defendants coerce Facebook to disable the ICE Sightings – Chicagoland group.

Defendants soon turned to coercing Facebook to disable Rosado's "ICE Sightings – Chicagoland" group. On October 12, Laura Loomer tagged Defendants Noem and Bondi in a social media post flagging the Chicagoland Facebook group, alleging it was among the ICE tracking apps and pages that "are getting people killed." McDonell Decl. Ex. DD. The next day, Loomer posted that her DOJ source had told her that DOJ "contacted Facebook and their executives at META to tell them they need to remove these ICE tracking pages from the platform." *Id.* Ex. EE.

Facebook disabled Rosado's Chicagoland group that day, with no prior notice to Rosado. Compl. ¶ 66. Again, Attorney General Bondi claimed credit in a social media post, writing, "following outreach from [DOJ], Facebook removed a large group," which she baselessly claimed "was being used to dox and target [ICE] agents in Chicago." McDonell Decl. Ex. KK. She went on to vow that DOJ "will continue engaging tech companies to eliminate platforms where radicals can incite imminent violence against federal law enforcement." *Id.* In another social media post that day, Secretary Noem affirmed that Facebook had removed the group "thanks to" DOJ, again warning that those who share information about ICE activities would be "prosecute[d] … to the fullest extent of the law." *Id.* Ex. LL.

The rationale Facebook gave Rosado for disabling her group was that it "went against the Community Standards." Rosado Decl. Ex. L1. But Facebook's policies don't provide for disabling groups if some members post content flagged by Facebook's moderators; they call for removing groups only when the group moderator repeatedly creates or affirmatively "approves" prohibited content. McDonell Decl. Ex. MM. Rosado didn't do that, Compl. ¶ 70, and Facebook offered this rationale only after receiving DOJ's demands.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction against defendants' coercion aimed at suppressing their speech, the platforms they created, and the speech of tens of thousands of people who used the platforms, because they can demonstrate likelihood of success on the merits, irreparable harm for loss of First Amendment rights, and that the public interest favors relief. *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729 (7th Cir. 2025). Plaintiffs are likely to succeed on their claim that defendants' coercion of tech and social media companies to suppress

their ICE-related speech violates the First Amendment. And when, as here, plaintiffs establish a likelihood of success in a First Amendment case, the remaining factors "are easily met." *Id.*

I. **Plaintiffs are likely to succeed on their First Amendment claims because the government coerced Apple and Facebook into suppressing their protected speech.**

A. **The First Amendment protects sharing information about public law enforcement activities.**

The starting point here is that the First Amendment squarely protects individuals' rights to observe, record, and share information about activities of law enforcement officers in public. "There is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs …." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (cleaned up). Speech about government officials' alleged misconduct "lies near the core of the First Amendment." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978). And this applies to speech about law enforcement officers as it does for all government officials. *See Butterworth v. Smith*, 494 U.S. 624, 626 (1990).

Sharing opinions about government officials is protected, even "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), or "criticism and challenge directed at police officers," *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). Our First Amendment right "to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 463.

More specifically, the First Amendment protects the right of individuals to record law enforcement officers in public and disseminate those videos. The Seventh Circuit so held in *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 586, 595–97 (7th Cir. 2012). Indeed, eight circuits have considered the issue and held the First Amendment protects filming law enforcement officers in public. *See Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022) (collecting cases in six other

circuits and concluding issue was "beyond debate"); *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023) (holding First Amendment protects recording police because it "creates information that contributes to discussion about governmental affairs").

In addition, the First Amendment protects not only plaintiffs' rights to speak but also their rights to create forums where others can speak and share information and views. *See Moody v. Netchoice, LLC*, 603 U.S. 707, 729–30 (2024) ("A private party's collection of third-party content into a single speech product … is itself expressive …."). Whether through sharing information about where ICE is conducting operations, or videos, or comments and opinions, this speech about our government and its activities is at the heart of what is protected by the First Amendment. Both the Eyes Up app and Rosado's Facebook group are clearly protected speech.

> **B.** **The government violated the First Amendment by coercing Apple and Facebook into suppressing protected speech.**

The second cardinal principle of First Amendment law applicable here is "that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or … through private intermediaries." *Vullo*, 602 U.S. at 198. Defendants "cannot do indirectly what [they are] barred from doing directly" under the First Amendment. *Id.* at 190. Variously called "informal prior restraints" or "jawboning," government actions to censor speech through coercion of intermediaries have been unconstitutional under the First Amendment for over sixty years.

In *Bantam Books, Inc. v. Sullivan*, the Supreme Court held that a Rhode Island commission violated the First Amendment by sending notices to book distributors indicating certain books were "objectionable," reminding that the commission's duty was to "recommend" prosecution of obscenity to the attorney general, and thanking distributors in advance for their "cooperation." 372 U.S. 58, 62–63 (1963). This constituted impermissible government censorship, notwithstanding

that the commission lacked any power to directly censor obscenity and claimed it "simply exhorts booksellers and advises them of their legal rights." *Id.* at 66. Recognizing that people "do not lightly disregard" government officials making "thinly veiled threats" of prosecution, the Court held this indirect censorship was an unconstitutional prior restraint. *Id.* at 68–71.

In *Backpage.com, LLC v. Dart*, the Seventh Circuit enjoined the Cook County sheriff who contacted Visa and Mastercard "demanding" they cease allowing their credit cards to be used on a website that contained adult ads. 807 F.3d 229, 230 (7th Cir. 2015). Although the sheriff lacked "authority to take any official action" and did not "directly threaten" Visa or Mastercard, his actions nevertheless constituted government coercion. *Id.* at 236–37. The Seventh Circuit held that the sheriff, by "intimating" that the credit card companies "may be" criminal accomplices if they didn't comply, used "the power of his office to threaten legal sanctions against the credit-card companies for facilitating future speech." *Id.* at 231–32. By doing so, the sheriff effected an informal prior restraint in violation of the First Amendment. *Id.* at 231–32, 235–36.

Most recently, in *Vullo*, the Supreme Court held the National Rifle Association's complaint, alleging that a New York state regulator had attempted to stifle its pro-gun advocacy by pressuring insurance companies to stop doing business with the NRA, stated a First Amendment violation. 602 U.S. at 191. The state official had authority over insurance companies and could initiate investigations and refer cases for prosecution. *Id.* at 192. In public statements and private communications, the official urged insurance companies to sever ties with the NRA, encouraging them to consider their "risks" in dealing with the organization and telling one that she would be "less interested" in pursuing regulatory infractions against companies that cut ties. *Id.* at 183–85. The Supreme Court reaffirmed what it said sixty years ago in *Bantam Books*: "Government

officials cannot attempt to coerce private parties in order to punish or suppress views the government disfavors." *Id.* at 180.

Bondi and Noem violated the First Amendment by strong-arming intermediaries (Apple and Facebook) into suppressing plaintiffs' speech. Government officials "violate[] the First Amendment through coercion of a third party" when their conduct, "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. The evidence here—including that Bondi and Noem made their censorship demands public and boasted when Apple and Facebook complied—amply demonstrates that defendants engaged in just this sort of coercion.

**_First_**, Bondi and Noem were not shy about revealing their actions directed at Apple and Facebook to make those platforms censor plaintiffs' speech. They publicly took credit for—indeed bragged about—contacting the platforms, demanding removal of apps and groups relating to ICE activities, and securing the platforms' compliance with these demands. *See* McDonell Decl. Exs. BB, KK, LL. Defendants didn't just ask nicely or pretend they were trying to persuade Apple or Facebook. *See id.* Ex. BB (Bondi "demanding" Apple remove an app); *id.* Ex. CC (Bondi "had Apple" take down the apps); *id.* Ex. LL (Noem saying Facebook "must" remove certain content and that the Chicagoland group was disabled "thanks to" DOJ); *see also id.* Ex. DD (a source reporting "DOJ ordered Apple"); Ex. EE (a source reporting DOJ told Facebook personnel they "need to" remove these groups). Defendants made "demands" and issued "orders," which is textbook coercion. *See Backpage.com*, 807 F.3d at 232 (noting sheriff's use of "demand" rather than "request"). When officials claim credit for compelling intermediaries to suppress protected speech, as Bondi and Noem did here, it is strong evidence the government did just that. *See id.* at

232 (noting the sheriff's "triumphant press release"); *Vullo*, 602 U.S. at 184, 194 (similarly relying on officials' press release).

**Second**, Bondi, Noem, and their subordinates repeatedly threatened criminal consequences toward individuals and entities even remotely affiliated with online tools documenting ICE activity. For example, when CNN ran a story about an ICE-tracking app, Noem and Bondi not only threatened the app's developer with criminal prosecution but threatened to prosecute CNN merely for its *reporting*. McDonell Decl. Exs. Y; *id.* Ex. Z, at 6:30. The threats continued as Bondi and Noem demanded compliance from Apple and Facebook. When Bondi publicly discussed her role in making Apple take down ICE-related apps, she said: "We're not going to stop at just arresting … criminals we see in the streets." *Id.* Ex. CC. And when Noem posted on social media about the government's role in making Facebook disable Rosado's group, she warned: "We will prosecute those who dox our agents to the fullest extent of the law." *Id.* Ex. LL.

**Third**, Bondi and Noem wield powers to initiate investigations and (in Bondi's case) prosecute criminal charges, making the government's coercion all the more threatening. Even government officials without the direct authority to make good on their threats can coerce. *See Bantam Books*, 372 U.S. at 66 (noting "Commission's want of power to apply formal legal sanctions"); *Backpage.com*, 807 F.3d at 236 (noting sheriff had "no authority to take any official action"). But when the officials do have the power to impose consequences—especially criminal consequences—it is a powerful factor indicating coercion. *Vullo*, 602 U.S. at 191–92 (noting that a letter from a federal prosecutor is more likely to be perceived as coercive than one from a school board). Bondi in particular—who does not oversee ICE—had no reason to contact Apple and Facebook *except* to flex her prosecutorial powers over those who might disregard her demands.

**Fourth**, that Apple and Facebook immediately complied with Bondi and Noem's demands makes the "causality … obvious." *Backpage.com*, 807 F.3d at 233. To be clear, the government's efforts to coerce Apple and Facebook were unconstitutional whether or not the platforms complied. *See id.* at 231 (holding that such demands violate the First Amendment even if the threat "turns out to be empty—the victim ignores it, and the threatener folds his tent"). But when the evidence reflects that intermediaries felt coerced—including because they promptly complied with government demands—it further proves the government's conduct was coercive. *Vullo*, 602 U.S. at 193. And here, the timing speaks volumes: Apple took down the Eyes Up app, and Facebook removed the Chicagoland group, within a day of receiving demands from the government. *See* Compl ¶¶ 51, 66; McDonell Decl. Exs. BB–EE.

Also telling is that, before receiving the government's demands, Apple and Facebook had no problem with Eyes Up or the Chicagoland group. Apple had approved Eyes Up five weeks earlier, after thoroughly reviewing the app and the content it was already hosting via its website. Compl. ¶¶ 39, 57–58. Facebook had allowed the Chicagoland group for over eight months, even affirmatively advising Rosado that the few user posts its moderators had removed "don't hurt your group." *Id.* ¶¶ 26, 32–33; Rosado Decl. Ex. C6. Only after the government made its demands did Apple and Facebook, with no prior notice to plaintiffs, suddenly discover purported grounds for immediate removal. As the Seventh Circuit observed in *Backpage.com*, "[W]hat would one expect [the coerced intermediary] to say? 'I am afraid of [the government official] … and afraid he might … get me investigated and even prosecuted … ?'" 807 F.3d at 233.

This is one of the most pernicious aspects of government censorship effected through coercion of third parties. Intermediaries like Apple and Facebook—when pressured by powerful government officials to suppress speech of their users—have little incentive to push back and risk

13

consequences for themselves. Large tech and social media companies have any number of reasons for concern about how the federal government might retaliate if they don't submit. To cite just one example, during the 2024 election, Trump railed against Facebook's content-moderation decisions, threatening Mark Zuckerberg with "life in prison." McDonell Decl. Ex. JJ. Then, after Trump won reelection, Zuckerberg announced changes to Facebook's moderation policies. *See id.* Ex. SS, at 0:28 (Trump agreeing this was "probably" a direct response to his threats). Easier to do what the government demands than to preserve the speech of some of its users. *See Vullo*, 602 U.S. at 198. Using the tactic of coercing third parties allows the government to expand its speech-suppression efforts "because intermediaries will often be less invested in the speaker's message and thus much less likely to risk the regulator's ire." *Id.* (cleaned up).

Put simply, the facts show that defendants (1) in their capacities as powerful government officials with criminal enforcement powers; (2) demanded Apple and Facebook take down the Eyes Up app and Chicagoland Facebook group; (3) while threatening criminal prosecution of anyone associated with online ICE-monitoring tools; and (4) publicly took credit when Apple and Facebook immediately complied. These facts make abundantly clear that Bondi and Noem's conduct "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech," *Vullo*, 602 U.S. at 191, in violation of the First Amendment.

## II.   Plaintiffs are suffering irreparable harm and the remaining factors favor granting relief.

When, as here, plaintiffs establish a likelihood of success on the merits of a First Amendment challenge, "the other preliminary injunction factors are easily met." *Reps. Comm.*, 147 F.4th at 729. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592

U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Rosado's Facebook group and the content posted there remains inaccessible to its nearly 100,000 members and the public, and Kreisau Group's app remains unavailable on Apple's App Store. Compl. ¶¶ 61, 74. The balance of harms and public interest favor granting a preliminary injunction because "injunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 679 F.3d at 590 (citation omitted).[3]

## CONCLUSION

Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction prohibiting DOJ and DHS officials from coercing Apple or Facebook to continue suppressing Rosado's Facebook group and Kreisau Group's app.

Dated: February 26, 2026

Respectfully Submitted,

/s/ *Colin P. McDonell*
Colin P. McDonell
James C. Grant (pro hac vice forthcoming)
Hannah M. Abbott (admitted pro hac vice)
Cary Davis (pro hac vice forthcoming)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
colin.mcdonell@fire.org
jim.grant@fire.org

---

[3] Should this Court grant a preliminary injunction, it should waive Rule 65(c)'s bond requirement. First, no bond is required for a case about upholding "constitutional principles." *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019); *see also, e.g.*, *Backpage.com*, 807 F.3d at 239 (waiving bond when granting preliminary injunction on First Amendment grounds). Second, no bond is required when the enjoined party will not incur damages from an injunction. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). That is the case here, as the government suffers "no harm at all" from an injunction against likely First Amendment violations. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006).

hannah.abbott@fire.org
cary.davis@fire.org

*Counsel for Plaintiffs*