UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KASSANDRA ROSADO and KREISAU GROUP LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 26 C 1532 |
| | ) | |
| PAMELA BONDI, in her official capacity as Attorney General, and KRISTI NOEM, in her official capacity as Secretary of Homeland Security, | ) | Judge Alonso |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**Table of Contents**

Table of Authorities ............................................................................................................. iii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................. 2

    I.       Factual Background ........................................................................................ 2

        A.  Rosado and "ICE Sightings – Chicagoland" ................................................ 2

        B.  Kreisau Group and "Eyes Up" ..................................................................... 3

        C.  September 24, 2025 – ICE Facility Shooting (Dallas) .................................. 3

        D.  Apple and Facebook Remove Kreisau's App and Rosado's Group Page. .................... 4

        E.  Plaintiffs' First Amendment Coercion Claims ............................................. 4

    II.      Legal Context .................................................................................................. 5

        A.  The Supreme Court's Decision in *Murthy v. Missouri* .............................. 5

        B.  The Supreme Court's Decision in *NRA v. Vullo* ....................................... 6

Legal Standard ...................................................................................................................... 8

Argument ............................................................................................................................... 8

    I.       Plaintiffs Lack Standing ................................................................................ 8

        A.  Plaintiffs Cannot Establish that Facebook and Apple Did Not Remove ICE Sightings – Chicagoland and Eyes Up Based on Their Pre-existing Guidelines .................... 9

        B.  Plaintiffs Fail to Show That Bondi and Noem Are Engaged in an "Ongoing Pressure Campaign" to Coerce Apple and Facebook to Continue Suppressing Plaintiffs' Speech .... 11

    II.     Plaintiffs Fail to Identify Conduct by Bondi or Noem That Could Be "Reasonably Understood to Convey a Threat of Adverse Government Action" Against Apple or Facebook .......................................................................... 13

        A.  Statements by Noem and Bondi About Facebook's Removal of "ICE Sightings – Chicagoland" ................................................................................ 15

        B.  Public Statements by Noem, Bondi, and Others about ICEBlock .............. 15

        C.  Communications from Apple and Facebook to Kreisau and Rosado Explaining the Reason for Removing Their Content .................................... 16

        D.  Social Media Posts by Laura Loomer ......................................................... 17

Conclusion ........................................................................................................................... 19

**Table of Authorities**

<u>Cases</u>

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) ................................................ 9

*Carney v. Adams*, 592 U.S. 53 (2020) ...................................................................................... 10

*Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2716 (2024) ....................................................................................................................... 11

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079 (7th Cir. 2008) ................................................................................................................................. 8

*Hart v. Facebook, Inc.*, 2024 WL 1693355 (9th Cir. Apr. 19, 2024) ........................................... 11

*Lawson Prod, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir. 1986) ................................................. 9

*Lujan v. Def. of Wildlife*, 504 U.S. 555 (1992) ....................................................................... 9, 10

*Munaf v. Geren*, 553 U.S. 674 (2008) ......................................................................................... 8

*Murthy v. Missouri*. 603 U.S. 43 (2024) ............................................................................. *passim*

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .......................................................... *passim*

*O'Shea* v. *Littleton*, 414 U. S. 488 (1974) ................................................................................. 12

**Introduction**

Plaintiff Kassandra Rosado started a Facebook group to allow other users to communicate and track the activity and location of ICE agents in the community as immigration enforcement surged in Chicago last year. Plaintiff Kreisau Group LLC ("Kreisau") created an app called "Eyes Up" to serve a similar purpose. Rosado and Kreisau claim that Attorney General Bondi Department of Homeland Security Secretary Kristi Noem made public statements that coerced Facebook to remove Rosado's group and Apple to remove Kreisau's app in violation of plaintiffs' First Amendment Rights. Plaintiffs seek an order enjoining Noem and Bondi from continuing to coerce Facebook and Apple into suppressing their speech. The court should deny the motion and dismiss for lack of standing.

Rosado and Kreisau lack standing for injunctive relief for two reasons. First, plaintiffs cannot establish that Facebook or Apple did not remove their content based on independent motivations to moderate content and enforce pre-existing policies. *See Murthy v. Missouri*. 603 U.S. 43, 60 (2024). Second, plaintiffs do not allege *any* coercive conduct by the defendants against Apple and Facebook, to say nothing of the "ongoing pressure campaign" necessary to establish standing for prospective injunctive relief in the First Amendment coercion context. *Id*.

Even if plaintiffs had standing, they are not entitled to injunctive relief because they are unlikely to succeed on the merits. Plaintiffs fail to identify any coercive communications or conduct by the defendants directed at Apple or Facebook. Instead, for example, plaintiffs rely on defendants' statements criticizing a different ICE tracking app and CNN's coverage of the app in the summer of 2025, months before Eyes Up became publicly available on the App Store. Plaintiffs also point to social media posts by a social media personality who is not a government employee but claims to have received information from an unidentified, secret source within the

1

Department of Justice. These public statements by defendants and social media posts by a non-government employee do not establish that plaintiffs are likely to succeed on their First Amendment coercion claims.

## Background

### I. Factual Background

#### A. Rosado and "ICE Sightings – Chicagoland"

According to the complaint, plaintiff Kassandra Rosado is a Chicago resident and small business owner who sells jewelry at local events in her community. Dkt. 1 at ¶ 24. Concerned with the expansion of immigration enforcement under the Trump administration and in Chicago, Rosado created a group on Facebook called "ICE Sightings – Chicagoland" in January 2025 to allow members of the community to alert others about the location and movement of ICE agents, to post photos and videos of enforcement operations, and to communicate about local immigration enforcement activity more broadly.[1] Dkt. 1 at ¶¶ 26, 29.

ICE began "Operation Midway Blitz" in September 2025, and immigration enforcement surged in the Chicago area. Dkt. 1 at ¶ 27. By October 2025, "ICE Sightings – Chicagoland" had more than 100,000 members, and users published thousands of posts, videos, and photographs concerning immigration enforcement activity in the community. Dkt. 1 at ¶¶ 28-29. Some of this content violated Facebook's Community Standards, and Facebook removed content from the group's page on at least five separate occasions. Dkt. 10-6 at 5-16.

---

[1] A Facebook group is a dedicated space on Facebook for people with shared interests to connect, discuss, and share content.

### B.   Kreisau Group and "Eyes Up"

Kreisau Group describes itself as "a technology driven group focused on exposing injustice, defending human rights, and building resilient tools for people living under increasingly authoritarian systems."  Dkt. 1 at ¶ 34.  The company's owner, Mark Hodges, created an online tool called "Eyes Up" to allow users to upload videos, record live content, and view videos uploaded by other users.  Dkt. 1 at ¶¶ 35-36.  The application also collects user geolocations and places a "pin" on a map for other users to see after moderators review and publish videos.  Dkt. 1 at ¶ 37.  Users uploaded hundreds of videos documenting ICE activity and operations since the application became available for free download on the App Store in August 2025.  Dkt. 1 at ¶ 39, 41.  Other applications with similar features were also available for free download on the Apple Store and Google Play in the summer and fall of 2025, including "ICEBlock" and "Red Dot."  Dkt. 1 at ¶ 39.

### C.   September 24, 2025 – ICE Facility Shooting (Dallas)

A 29-year-old man drove to an ICE facility in Dallas, Texas on September 24, 2025, climbed the roof of an adjacent building, and shot indiscriminately at law enforcement officers, ICE detainees, and others nearby.  Elizabeth Wolfe, *ICE shooter's writings were 'definitively anti-ICE' and included 'hatred for the federal government,' prosecutor says*, CNN, Sept. 26, 2025, https://www.cnn.com/2025/09/25/us/wwk-dallas-ice-facility-shooting, (last visited Mar. 19, 2026).  The shooter killed one person and critically injured two others before turning the gun on himself and leaving behind handwritten notes expressing a "hatred for the federal government." *Id*.  According to FBI investigators, "he wrote that he intended to maximize lethality against ICE personnel", to "maximize property damage at the facility", and that he "hoped his actions would give ICE agents real terror of being gunned down." *Id*.  Investigators later discovered that the

3

shooter had planned the attack for months and searched apps that tracked the presence of ICE agents.  Dkt. 10-4 at 22.

 **D.**  **Apple and Facebook Remove Kreisau's App and Rosado's Group Page**

Nine days after the Dallas shooting, Apple removed Eyes Up from the Apple Store and released a statement, explaining that the application and others like it violate the company's guidelines.  Dkt. 1 at ¶ 51-52.  Apple further explained that "[i]nformation provided to Apple by law enforcement shows that your app violates" the app store guidelines because "its purpose is to provide location information about law enforcement officers that can be used to harm such officers individually or as a group."  Dkt. 1 at ¶ 52, n.30.

On October 13, 2025, Facebook removed "ICE Sightings – Chicagoland" from its platform for repeatedly violating the company's Community Standards.  Dkt. 1 at ¶¶ 66, 69.  In a public statement, Attorney General Bondi said that "Facebook removed a large group" that was "being used to dox and target ICE agents in Chicago" following outreach from the Department of Justice. Dkt 1 at ¶ 67.  On the same day that Facebook removed her group, Rosado created a second group titled "ICE Sightings – Chicagoland 2."  Dkt. 1 at ¶ 73.  This group serves the same purpose as its predecessor, although Rosado implemented limitations on who can join the group and moderates the content posted.  Dkt. 1 at ¶ 73.  "ICE Sightings – Chicagoland 2" is an active group on Facebook and currently has approximately 50,000 members.  Dkt. 1 at ¶ 73.

 **E.**  **Plaintiffs' First Amendment Coercion Claims**

Plaintiffs brought this suit against Bondi and Noem in their official capacities, asserting First Amendment coercion claims against the defendants.  Dkt. 1 at ¶¶ 83-103.  Plaintiffs seek an order declaring that Bondi and Noem violated plaintiffs' First Amendment Rights, and an order enjoining the defendants and their agents from "continuing to coerce" Facebook and Apple into

4

suppressing "ICE Sightings – Chicagoland" and Eyes Up on Facebook and the App Store.  Dkt. 1 at 28.

## II.      Legal Context

This case is controlled by two recent Supreme Court decisions: (1) *Murthy v. Missouri*, 603 U.S. 43 (2024), which sets the standards for Article III standing for allegations that the government is coercing third-party platforms to censor free speech; and (2) *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024), which governs the substantive requirements for a viable First Amendment coercion claim.

### A. The Supreme Court's Decision in *Murthy v. Missouri*

In *Murthy*, the Court concluded that plaintiffs lacked standing to claim the government coerced social media platforms to censor plaintiffs' posts regarding COVID-19 and the 2020 election.  *Murthy*, 603 U.S. at 43.  The Court reasoned that to establish standing "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one government defendant."  *Id.* at 58. "And even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content."  *Id.* at 61.

The Court held that the plaintiffs in *Murthy* failed to make that requisite showing.  *First*, the Court concluded that the plaintiffs had not established "specific causation" because they had failed to show "that a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic."  *Id.* at 59-61. Assessing the asserted "direct censorship injuries" on a plaintiff-by-plaintiff, defendant-by-defendant, and platform-by-platform basis, the Court concluded that no plaintiff had standing to claim that past injuries were traceable to the government's conduct.  *Id.* at 58-68.

*Second*, the Supreme Court emphasized that plaintiffs failed to show "a real and immediate threat of repeated injury," as required to obtain prospective relief. *Id.* at 58 (citation omitted). Thus, "without proof of an ongoing pressure campaign," the Supreme Court concluded it was "entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id.* at 69.

**B. The Supreme Court's Decision in *NRA v. Vullo***

In *NRA v. Vullo*, the Court held that the National Rifle Association of America (NRA) plausibly alleged that Vullo, the superintendent of the New York Department of Financial Services (DFS), violated the First Amendment by coercing DFS-regulated entities to terminate their business relationships with the NRA to punish or suppress its gun-promotion advocacy. *Vullo*, 602 U.S. at 175.

The Court declared that "to state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id*. at 177 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-68 (1963)). In other words, "[w]hen government officials are engaging in their own expressive conduct," "the Free Speech Clause has no application," but "a government official cannot directly or indirectly coerce a private party to punish or suppress disfavored speech on her behalf." *Id*. at 176-77 (citation omitted).

In this analysis, the objective inquiry of "whether a reasonable person would perceive a government official's communications as coercive"—thus crossing the line from permissible expression and persuasion to impermissible coercion in violation of the First Amendment— requires looking to: (1) the government official's authority, (2) the communications between the

6

government official and the entity, and (3) the coerced party's reaction. *Id*. at 191-93.

*First*, the Court outlined that, while "the power that a government official wields" "is not dispositive," "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id*. at 191-92. As New York's Department of Financial Services superintendent, "Vullo had direct regulatory and enforcement authority over all insurance companies and financial service institutions doing business in New York," *id*. at 192, and "the power to initiate investigations and civil enforcement actions" and "to refer matters for criminal prosecution." *Id*. at 175.

*Second*, the Court found Vullo's alleged communications with DFS-regulated entities could "be reasonably understood as a threat or as an inducement" constituting coercion, although Vullo did not explicitly threaten prosecution for failure to aid in "DFS's campaign against gun groups." *Id*. at 193. Plaintiffs identified numerous, specific alleged communications in their complaint, including a private meeting with insurance executives during which Vullo pointed to a variety of infractions that DFS would be "be less interested in pursuing" if the regulated insurance entities "ceased providing insurance to gun groups, especially the NRA." *Id*. at 192 (cleaned up). Vullo told the executives she would "'focus' her enforcement actions 'solely' on the syndicates with ties to the NRA." *Id*. Vullo also issued guidance letters in which she encouraged DFS-regulated entities to consider their "reputational risks," "including those that may arise from their dealings with the NRA," and encouraged the entities to "take prompt actions to manag[e] these risks" by discontinuing their arrangements with the NRA. *Id*. at 176. *Third*, the Court considered the regulated entities' reaction to Vullo's actions, which was to quickly terminate all insurance related to the NRA. *Id*. at 193.

7

**Legal Standard**

Preliminary injunctive relief is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits of the underlying claim; (2) the absence of an adequate remedy at law; and (3) the suffering of irreparable harm if preliminary relief is denied. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant fails to show any one of the requirements, the court "must deny the injunction." *Id*. If the movant satisfies all three requirements, the court must then "balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Lawson Prod, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (quotation marks omitted). The court weighs the factors using a sliding-scale approach: the less likely the movant's chance of success on the merits, the more the balance of harms must weigh in the movant's favor. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

**Argument**

## I. Plaintiffs Lack Standing

As a threshold matter, plaintiffs lack standing. An "essential and unchanging part of the case-or-controversy requirement" in the Constitution is that a plaintiff must establish Article III standing to sue. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). Under Article III, "the irreducible constitutional minimum" requires that (1) the plaintiff has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3)

8

it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (cleaned up).

A plaintiff bears the burden of proving standing at the time she brings a lawsuit and maintaining it thereafter. *Carney v. Adams*, 592 U.S. 53, 59 (2020). She must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the preliminary injunction stage, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58. As explained below, plaintiffs cannot establish traceability or redressability.

### A. Plaintiffs Cannot Establish that Facebook and Apple Did Not Remove ICE Sightings – Chicagoland and Eyes Up Based on Their Pre-existing Guidelines

Plaintiffs lack standing because they fail to establish that Apple and Facebook did not remove their content based on their own pre-existing policies and independent incentives to moderate content, rather than coercion by the defendants. To establish the second prong required for standing, causation, the plaintiff must have suffered an injury that is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Lujan,* 504 U.S. at 560.

Here, Rosado and Kreisau must establish that the defendants' past statements or action caused Facebook and Apple to remove plaintiffs' content in October 2025, rather than the alternative explanation that Facebook and Apple were provided with relevant law enforcement information and made independent content-moderation decisions of their own accord under their existing policies. *See Murthy*, 603 U.S. at 64 (finding unlikely plaintiff's injuries were traceable to defendant government agency when Twitter removed plaintiff's post according to the platform's pre-existing policy against posting private, intimate media without subject's express consent); *see also Changizi v. Dep't of Health & Hum. Servs*., 82 F.4th 492, 497 (6th Cir. 2023), *cert. denied*,

9

144 S. Ct. 2716 (2024) (holding, at the pleading stage, that the plaintiffs lacked standing because they "fail to adduce facts demonstrating that the decisions Twitter made when it enforced its own COVID-19 policy did not result from its 'broad and legitimate discretion' as an independent company"); *see also Hart v. Facebook, Inc.*, 2024 WL 1693355, at *3 (9th Cir. Apr. 19, 2024) ("Because [the plaintiff] has not plausibly alleged that Twitter and Facebook acted at the behest of the Federal Defendants—as opposed to pursuant to their own policies—he has not shown that a favorable judicial decision against the Federal Defendants would provide him any relief."). Neither plaintiff can meet this burden.

Apple removed Eyes Up from the App Store nine days after the shooting at the Dallas ICE facility. Dkt. 10-4 at 22; Dkt. 1 at ¶ 41. In a public statement, Apple stated that the company "created the App Store to be a safe and trusted place to discover apps . . . . Based on *information* we've received from law enforcement about the safety risks associated with ICEBlock, we have removed it and similar apps from the App Store." Dkt. 10-4 at 22 (emphasis added). Apple also sent a message to Kreisau directly that was consistent with its public statement, explaining that it removed Eyes Up from the App Store because the company received information from law enforcement showing that the app violated its own guidelines because "its purpose is to provide location information about law enforcement officers that can be used to harm such officers individually or as a group." Dkt. 1 at ¶ 56. In this communication, Apple cited section 1.1.1 of its App Review Guidelines and its prohibition on content that is "likely to harm a targeted individual or group." Dkt. 10-8 at 10. Facebook sent a similar message to Rosado, stating that it suspended "ICE Sightings – Chicagoland" because some of the posted activity violated the platform's Community Standards, including rules against "coordinating harm and promoting crime." Dkt. 10-6 at 40; *see Murthy*, 603 U.S. at 64 (finding unlikely plaintiff's injuries were traceable to

10

defendant government agency when Twitter removed plaintiff's post according to the platform's pre-existing policy against posting private, intimate media without subject's express consent). In sum, Rosado and Kreisau lack standing because they fail to establish that Apple and Facebook acted at the behest of Noem and Bondi, as opposed to the platforms' existing policies, when removing plaintiffs' content in October 2025.

**B. Plaintiffs Fail to Show That Bondi and Noem Are Engaged in an "Ongoing Pressure Campaign" to Coerce Apple and Facebook to Continue Suppressing Plaintiffs' Speech**

Even if they could establish an injury in fact traceable to defendants, plaintiffs nevertheless lack standing for injunctive relief. Plaintiffs cannot demonstrate that Bondi and Noem are engaged in an ongoing pressure campaign to suppress their free speech, as Article III demands for First Amendment coercion claims. To obtain forward-looking relief, a plaintiff must show "a substantial risk of *future* injury that is traceable to the Government defendants and *likely to be redressed* by an injunction against them." 603 U.S. at 58 (emphasis added); *O'Shea* v. *Littleton*, 414 U. S. 488, 496 (1974) (holding that plaintiffs must face "a real and immediate threat of repeated injury"). In other words, plaintiffs must do more than make allegations of past injury. *See id*. at 495–96 ("Past exposure to illegal conduct" can serve as evidence of threatened future injury but "does not in itself show a present case or controversy regarding injunctive relief.").

In the First Amendment coercion context, plaintiffs must allege "an ongoing pressure campaign" by the government without which it is "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants," and there would be no basis for injunctive relief. *Murthy*, 603 U.S. at 69. Plaintiffs' allegations fall short of meeting this threshold where plaintiffs do not assert "a substantial risk that, in the near future" Apple and

Facebook will restrict their speech "in response to the actions of at least one Government defendant." *Id.* at 58.

Here, plaintiffs ask the court (1) to declare that Bondi and Noem coerced Facebook and Apple into removing "ICE Sightings – Chicagoland" and Eyes Up, thereby "suppressing disfavored speech in violation of the First Amendment"; and (2) to enter an order enjoining defendants from continuing to coerce Facebook and Apple into suppressing plaintiffs' speech. Dkt. 1 at 28; Dkt. 10-1 at 15. Accordingly, plaintiffs must show that defendants were actively pressuring Facebook and Apple to *keep* Eyes Up off the App Store and "ICE Sightings – Chicagoland" off Facebook at the time the complaint was filed. Plaintiffs cannot meet this burden.

Plaintiffs' allegations focus entirely on public statements made by Bondi, Noem, and other government officials between June 30, 2025, and October 14, 2025. *See, e.g.*, Dkt. 1 at ¶¶ 43-49, 66, 68. Plaintiffs do not allege that Bondi or Noem undertook any action or communicated with Facebook or Apple in the last five months (after October 14, 2025). Accordingly, based on the allegations in the complaint and in the motion for a preliminary injunction, plaintiffs cannot establish that "they [were] likely to face a risk of future censorship traceable to the [Defendants]" when they filed the complaint all these months later. *Murthy*, 603 U.S. at 73 ("[W]ithout evidence of *continued* pressure from the defendants, . . . the platforms remain free to enforce, or not to enforce, those policies—even those tainted by initial governmental coercion." (emphasis added)).

In fact, for Rosado, the complaint affirmatively demonstrates that there is no ongoing pressure campaign to Facebook that could justify prospective injunctive relief. Rosado created a new, hardly disguised Facebook group entitled "ICE Sightings – Chicagoland 2" the same day that Facebook removed "ICE Sightings – Chicagoland." Dkt 1 at ¶ 73. This new group also encourages users to share any ICE sightings in the Chicagoland area, but it differs in at least two important

12

respects. Rosado has placed additional restrictions on the group to screen users before they can join and to moderate content posted. Dkt 1 at ¶ 73. As of the date of this filing, the group remains on Facebook and currently has more than 49,000 followers. Dkt 1 at ¶ 73. Had Bondi or Noem engaged in an ongoing pressure campaign against Facebook to suppress Rosado's speech, Facebook would have removed "ICE Sightings – Chicagoland 2" as well.[2]

Accordingly, plaintiffs lack standing for injunctive relief because they cannot establish an "ongoing pressure campaign" by Noem and Bondi to suppress plaintiffs' speech.[3]

II.      **Plaintiffs Fail to Identify Conduct by Bondi or Noem That Could Be "Reasonably Understood to Convey a Threat of Adverse Government Action" Against Apple or Facebook**

Plaintiffs are not entitled to injunctive relief because they cannot establish a likelihood of success on the merits. "To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action [against the third party] in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. In determining whether a reasonable person would perceive a government official's communications as coercive, courts consider (1) the government official's authority, (2) the communications between the government official and the entity, and (3) the coerced party's reaction. *Id*.

In *Vullo*, the Supreme Court found the NRA stated a plausible First Amendment coercion claim when the NRA alleged that Department of Financial Services Superintendent Vullo: (1)

---

[2] Unlike "ICE Sightings – Chicagoland", there is no indication in the complaint that Facebook has identified any content on "ICE Sightings – Chicagoland 2" that violates the Community Standards.

[3] Because this Court lacks jurisdiction to issue injunctive relief, it also lacks jurisdiction to issue declaratory relief, which "would amount to an advisory opinion without the possibility of any judicial relief." *California v. Texas*, 593 U.S. 659, 673 (2021) (citation omitted).

suggested during a meeting with insurance executives that insurance entities could avoid liability for infractions if they aided DFS' campaign against the NRA; and (2) issued guidance letters reminding DFS-regulated entities of their obligation to consider their "reputational risks" of being associated with the NRA. *Id*. at 184.

Here, on a motion for a preliminary injunction, plaintiffs face a higher burden than the NRA in *Vullo*. Yet, plaintiffs fail to identify the content of *any* communication between defendants, and Apple or Facebook concerning either Eyes Up or "ICE Sightings—Chicagoland." Plaintiffs do not allege that Bondi or Noem threatened Facebook or Apple with investigations, enforcement proceedings, or any other adverse government action should those entities refuse to comply with requests to remove plaintiffs' content. Nor do plaintiffs allege any conduct analogous to Superintendent Vullo's oral and written statements that the Supreme Court found could be "reasonably understood" to threaten civil enforcement actions or criminal prosecution. *Vullo*, 602 U.S. at 193.

Instead, plaintiffs largely rely on four categories of communications to establish coercion against Facebook and Apple: (i) two social media posts by Noem and Bondi stating that Facebook removed a group that matches the description of "ICE Sightings – Chicagoland"; (ii) public statements by Noem and Bondi about ICEBlock, a *different* ICE-tracking application that has no connection to plaintiffs; (iii) communications from Apple to Kreisau, and from Facebook to Rosado, explaining the reason for removing their content from their respective platforms; and (iv) social media posts by a conspiracy theorist and internet personality who is not a government employee. Dkt. 10-1 at 14. Noem and Bondi address each in turn below.

14

**A. Statements by Noem and Bondi About Facebook's Removal of "ICE Sightings – Chicagoland"**

Rosado cites two social media posts that Bondi and Noem published on October 14, 2025. Dkt. 10-4 at 63 and at 65. The posts state that Facebook removed a large group page that was being used to dox and target ICE agents in Chicago following outreach from the Justice Department. Dkt. 10-4 at 63. Bondi's post also states that the Department of Justice will continue to engage tech companies. *Id*. Noem's post is substantially the same and adds "Facebook must be PROACTIVE in stopping the doxxing of our [ICE] law enforcement." Dkt. 10-4 at 65. Critically, these posts are the only statements by Noem or Bondi that refer either directly or indirectly to "ICE Sightings – Chicago."

These posts cannot be interpreted as a threat of adverse governmental action because they were published *after* Facebook removed Rosado's group, and simply announce the action taken by Facebook. Dkt. 10-4 at 63 ("Facebook *removed* a large group page that was being used to dox and target [ICE] agents in Chicago") (emphasis added); Dkt. 10-4 at 65. At most, these posts establish that Bondi or a Justice Department representative contacted Facebook. Mere communication between government officials, Apple, and Facebook is not enough to establish coercion. *Murthy v. Missouri*, 603 U.S. 43, 69 (2024) ("[W]e must confirm that each Government defendant continues to engage in the challenged conduct, which is 'coercion' and 'significant encouragement,' not mere 'communication.'"). Absent specific allegations of conduct that can be reasonably interpreted as threatening government action against Facebook, Rosado cannot establish a likelihood of success on the merits for her First Amendment coercion claim.

**B. Public Statements by Noem, Bondi, and Others about ICEBlock**

Kreisau's First Amendment coercion claim is even more attenuated. Kreisau fails to identify the content of any statements that the defendants made to Apple about Eyes Up, either

publicly or privately. Rather, to establish its coercion claim, Kreisau relies on public statements made by Noem, Bondi, and others about ICEBlock, a *different* ICE-tracking application that has no connection to plaintiffs. Dkt 10-1 at 5. Kreisau relies on Bondi and Noem's public statements criticizing ICEBlock and CNN's coverage of the app. Dkt 10-1 at 5 (stating that the Department of Justice was "looking at" whether ICE tracking apps violate the law).

None of these public statements about ICEBlock refer to, or are directed at, Apple. Nevertheless, Kreisau asserts that Apple must have understood Noem and Bondi's public statements criticizing ICEBlock and CNN as threatening adverse government action against Apple if it failed to remove *Eyes Up* from the App Store. This argument fails. Eyes Up was not available for download in the App Store until two months after Bondi's June 2025 statements. Dkt. 1 at ¶ 39 (stating that Eyes Up became available for download on Apple's App Store on August 27, 2025).[4] Defendants' statements in June 2025 cannot be reasonably understood to threaten adverse government action if Apple failed to remove an app that was not yet available in the App Store.

## C. Communications from Apple and Facebook to Kreisau and Rosado Explaining the Reason for Removing Their Content

Next, plaintiffs rely on communications received from Apple and Facebook explaining the basis for removing Eyes Up and "ICE Sightings – Chicagoland." Apple notified Kreisau that it removed Eyes Up based on "information provided to Apple by law enforcement because its purpose is to provide location information about law enforcement officers that can be used to harm such officers individually or as a group." Dkt. 10-8 at 10. As the basis for removing Eyes Up,

---

[4] Plaintiffs also cite to statements by ICE Director Todd Lyons and Tom Homan in June 2025. Dkt 10-1 at 5; Dkt. 10-4 at 15 (June 30, 2025 statements by ICE Director Todd Lyons regarding ICEBlock and CNN's coverage); *Id*. at 17 (June 30, 2025 statements by Tom Homan in an interview concerning ICEBlock). Neither Lyons nor Homan is named as a defendant in this case.

Apple cited to section 1.1.1 of the App Review guidelines, which prohibit certain content that is "likely to humiliate, intimidate, or harm a targeted individual or group." *Id*. Kreisau insists that the defendants must have coerced Apple because Apple approved Eyes Up for inclusion on its App Store in August 2025. Dkt. 10-1 at 4. Plaintiffs suggest that Apple's removal of the app five weeks later could only have been the result of government coercion. Dkt. 10-1 at 6. A closer reading of Apple's statement to Kreisau dispenses with plaintiff's argument.

Apple removed Eyes Up from the App Store because, by providing location information about law enforcement officers, Eyes Up "*can be used* to harm such officers individually or as a group." Dkt. 10-8 at 10 (emphasis added). Apple received information from the government that alerted the company to this fact, and the company removed the app under its pre-existing policies against content that is likely to harm a targeted individual or group. *Id*. Facebook sent a similar statement to Rosado, explaining that the group violated Facebook's Community Standards. Dkt 10-6 at 38,40 (stating that the group violates the Community Standards on coordinating harm and promoting crime). Neither are indicia of coercion.

### D. Social Media Posts by Laura Loomer

Finally, plaintiffs rely on two social media posts by Laura Loomer to establish coercion against Facebook. Loomer is a prominent internet personality who is not employed with the Department of Justice, the Department of Homeland Security, or any other government agency. In an October 13, 2025 social media post, Loomer identified "ICE Sighting – Chicagoland" and stated that the Facebook group provided location updates on ICE raids and agent locations in the Chicago area. Dkt. 10-4 at 34. The post then criticized "Big Tech" and accused Mark Zuckerberg of unspecified crimes. Dkt. 10-4 at 34. Loomer published another post the next day stating, "a DOJ source tells me that they have seen my report and they have contacted Facebook and their

17

executives at Meta to tell them they need to remove these ICE tracking pages from the platform." Dkt. 10-4 at 35.

Plaintiffs ask the court to credit Ms. Loomer's statements, her claim about an unidentified source within the Department of Justice, and Loomer's hearsay characterization of that source's statements about government communications with Facebook representatives. From this, plaintiffs ask the court to conclude that Bondi and Noem engaged in conduct that a reasonable person would understand to threaten adverse governmental action against Facebook if it failed to remove Rosado's group.

Even if the court were to credit Loomer's hearsay statements as true (and it should not), it cannot assess the statements under the framework set out in *Vullo*, 602 U.S. at 191 (explaining that, when determining if a government official's communications are coercive, courts should consider (1) the government official's authority, (2) the communications between the government official and the entity, and (3) the coerced party's reaction.) The court cannot identify the government official Loomer refers to, assess the communications described, or gauge the reaction of the unnamed "executives" involved. The court should disregard Loomer's social media posts altogether.

\*     \*     \*

In sum, the court should deny plaintiff's motion for injunctive relief because plaintiffs are unlikely to prevail on the merits. Neither Rosado nor Kreisau can establish that defendants "threatened to wield [their] power against" Apple and Facebook if either platform refused to suppress plaintiffs' speech. *Vullo*, 602 U.S. at 177.

18

## Conclusion

For the above reasons, the court should deny plaintiffs' motion for a preliminary injunction and dismiss for lack of standing.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Thomas M. Cull
THOMAS M. CULL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-4190
thomas.cull@usdoj.gov

19