**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KASSANDRA ROSADO and KREISAU GROUP LLC, | |
| *Plaintiffs*, | Civil Action No.: 1:26-cv-01532 |
| v. | Hon. Jorge L. Alonso |
| TODD BLANCHE, in his official capacity as Acting Attorney General, and | |
| MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, | |
| *Defendants*. | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................... ii

INTRODUCTION .....................................................................................................................1

ARGUMENT.............................................................................................................................2

I.      Plaintiffs have standing. ................................................................................................2

          A.      Plaintiffs satisfy all elements of standing. .........................................................2

          B.      Defendants misconstrue *Murthy*, which does not negate standing here..................4

          C.      The evidence shows that Apple and Facebook did not apply their own policies independent of government pressure. .........................................................6

          D.      The government's threats and demands hang over Apple and Facebook. ..............9

II.     Plaintiffs are likely to succeed on their First Amendment claims....................................12

CONCLUSION .......................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Univ. Professors v. Trump*,
2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ...........................................................................6

*Backpage.com LLC v. Dart*,
807 F.3d 229 (2015) .............................................................................................................passim

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ...............................................................................................................passim

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ..................................................................................................9, 10

*CAIR-Foundation, Inc. v. Desantis*,
2026 WL 613468 (N.D. Fla. Mar. 4, 2026)...........................................................................13, 14

*Changizi v. Dep't of Health & Hum. Servs.*,
82 F.4th 492 (6th Cir. 2023).........................................................................................................5

*Chiles v. Salazar*,
2026 WL 872307 (U.S. Mar. 31, 2026)......................................................................................10

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ......................................................................................................................3

*Federal Trade Comm'n v. Lifewatch, Inc.*,
176 F. Supp. 3d 757 (N.D. Ill. 2016).........................................................................................14

*Hart v. Facebook, Inc.*,
2024 WL 1693355 (9th Cir. Apr. 9, 2024)...................................................................................5

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ......................................................................................................................3

*Kentucky v. Graham*,
473 U.S. 159 (1985) ......................................................................................................................3

*Murthy v. Missouri*,
603 U.S. 43 (2024) ...............................................................................................................passim

*NRA v. Vullo*,
602 U.S. 175 (2024) .............................................................................................................passim

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ......................................................................................................................9

*Okwedy v. Molinari*,
   333 F.3d 339 (2d Cir. 2003) .................................................................................11

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) .............................................................................................2

*SEC v. Cherif*,
   933 F.2d 403 (7th Cir. 1991) ..............................................................................14

*Six Star Holdings, LLC v. City of Milwaukee*,
   821 F.3d 795 (7th Cir. 2016) ................................................................................2

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .............................................................................................2

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President*,
   784 F. Supp. 3d 127 (D.D.C. 2025).....................................................................13

**Rules**

Fed. R. Civ. P. 65(d)(2) ..............................................................................................3

**Other Authorities**

Cate Charron,
   *Lawsuit: Bondi, Noem coerced Apple to remove Indiana man's ICE monitoring app*,
   INDIANAPOLIS STAR (Feb. 11, 2026).....................................................................10

FBI Director Kash Patel (@FBIDirectorKash), X (Sept. 25, 2025, at 10:03 AM) ........................7

**INTRODUCTION**

Plaintiffs' preliminary injunction motion is based on simple facts. *See* Pls.' Br., Dkt. No. 10-1. DHS and DOJ officials publicly threatened prosecution for online tools reporting on ICE activities. DOJ then contacted Apple and Facebook "demanding" they take down Rosado's Facebook group and apps like Kreisau Group's Eyes Up. In each case, Apple and Facebook complied within a day, publicly admitting they did so because of the government outreach. The heads of DOJ and DHS then publicly boasted and took responsibility for the takedowns.

In its opposition brief, the government does not deny these facts. *See* Opp'n, Dkt. No. 30. Instead, it attempts to deflect by speculating there might have been some other reason Facebook and Apple took down the group and app apart from the government's demands that they do so. And it contends plaintiffs lack standing and fail on the merits based on *Murthy v. Missouri*, 603 U.S. 43 (2024), and *NRA v. Vullo*, 602 U.S. 175 (2024), but it misreads both cases.

First, the government contends *Murthy* established new, more exacting requirements for standing in cases involving government pressure on intermediaries to censor speech it dislikes. *See* Opp'n at 5–6. It did not. The Supreme Court in *Murthy* took pains to explain it was *not* creating any "new and heightened standard." 603 U.S. at 68 n.8. Rather, *Murthy* applied ordinary standing principles to "sprawling" claims where, for various reasons, plaintiffs could not show suppression of their speech was traceable to government conduct. *Id.* at 61, 68–74. Here, by contrast, the facts are simple and the government's role clear, akin to the Supreme Court's seminal decision invalidating coercion of intermediaries to censor speech, where standing to obtain a prospective injunction unquestionably existed. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).

On the merits, the government misconstrues *Vullo* as creating a list of mandatory requirements, such as showing the precise communications from government officials to intermediaries.

1

Opp'n at 6, 13–14. But the Court in *Vullo* expressly rejected such an approach in favor of a holistic analysis of whether government officials' conduct in context "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." 602 U.S. at 191; *see also id.* at 199 (Gorsuch, J., concurring). Here, where the government admits it demanded that intermediaries suppress speech and offers no evidence to the contrary, the case falls squarely within the constitutional principle *Vullo* reaffirmed: "A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf" and "cannot do indirectly what she is barred from doing directly." *Id.* at 190.

ARGUMENT

## I.      Plaintiffs have standing.

### A.      Plaintiffs satisfy all elements of standing.

Plaintiffs have standing to challenge the government's conduct that, as *defendants themselves boasted*, caused Apple and Facebook to suppress online forums for protected speech about ICE activities. Plaintiffs have Article III standing when there is (1) a cognizable injury, that is (2) "fairly traceable to the challenged conduct," and (3) "likely to be redressed by a favorable judicial decision." *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801 (7th Cir. 2016). Plaintiffs readily satisfy these elements here.

To start, the government does not contest that the loss of First Amendment rights is a cognizable injury. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)). The suppression of Rosado's Facebook group and Kreisau Group's app, which respectively remain disabled on Facebook and the App Store, are ongoing injuries to First Amendment rights.

2

Second, this speech suppression—the takedown of the Chicagoland Facebook group and the Eyes Up app—is plainly traceable to the conduct of DOJ and DHS officials.[1] DOJ and DHS officials *admitted* they demanded removal of the Chicagoland group and apps reporting on ICE activity. *See* Pls.' Br. at 11 (summarizing officials' statements about demands and orders to Apple and Facebook). In this regard, the Court can and should take DOJ and DHS officials at their word.

And the record corroborates their admissions. For example, as explained in plaintiffs' opening brief, Apple took down the Eyes Up app and Facebook removed the Chicagoland group within a day of receiving the government's demands; that timing alone makes the "causality … obvious." *Backpage.com LLC v. Dart*, 807 F.3d 229, 233 (2015); *see* Pls.' Br. at 13. Until receiving the government's demands, Apple and Facebook had no problem with Eyes Up (which Apple had approved after thorough review just five weeks earlier) or the Chicagoland group (which Facebook had allowed to continue for over eight months).

For standing purposes, traceability merely requires that government conduct played a causal role in the injury. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). For the government to contend its actions—publicized threats of criminal consequences, followed by admitted demands to Apple and Facebook—played *no* role in the takedowns of Eyes Up and the Chicagoland group strains credulity. This Court should credit the government's contemporaneous statements about their demands and the platforms' compliance, rather than the government's newfound claim that the takedowns had nothing to do with it. *Cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (crediting government's contemporaneous rationale for interfering

---

[1] In this official-capacity suit, the real parties in interest are DOJ and DHS as entities, not the named agency heads as individuals. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The lawsuit seeks to enjoin all employees of DOJ and DHS, as is proper under Rule 65. *See* Compl., Dkt. No. 1, at 28; Fed. R. Civ. P. 65(d)(2). So contrary to the government's protestations, Opp'n at 16 n.4, statements by all agency officials (like Todd Lyons, acting director of ICE) are relevant.

3

with First Amendment rights rather than explanation "invented *post hoc* in response to litigation").

Third, the requested injunction to stop government coercion redresses plaintiffs' injuries by getting the government out of the picture when it comes to what protected speech private companies choose to host or facilitate. That is the most redress courts can provide in jawboning cases to remedy ongoing harm, and courts regularly provide such relief. *See Backpage.com*, 807 F.3d at 238 (granting injunction prohibiting future coercion by the sheriff, the "only remedy" available); *Bantam Books*, 372 U.S. at 64 n.6 (concluding standing unquestionably existed for injunctive relief claim). That is the relief plaintiffs seek here.

**B.      Defendants misconstrue *Murthy*, which does not negate standing here.**

Defendants' argument seeking to overcome plaintiffs' standing hinges on misreading *Murthy v. Missouri*, 603 U.S. 43 (2024). *See* Opp'n at 1, 5–6, 9–12. The Supreme Court made clear in *Murthy* it was not creating any "new and heightened standard" for standing in jawboning cases. 603 U.S. at 68 n.8. All *Murthy* did was apply ordinary standing principles in a case where the plaintiffs struggled to show the government played a role in the suppression of their speech. And that isn't an issue here.

Unlike this case, with its simple fact pattern and straightforward causation, *Murthy* was a "sprawling suit" based on "murky" evidence of causation. *Id.* at 61, 68 n.8. Seven plaintiffs sued dozens of federal officials and agencies, alleging the defendants had coerced a number of social media companies (including Facebook, Twitter, YouTube, and LinkedIn) into removing or demoting posts about COVID-19 and federal elections. The *Murthy* plaintiffs' allegations of censorship hinged on "years-long communications between dozens of federal officials, across different agencies, with different social-media platforms, about different topics." *Id.* at 76. For various reasons, the Court held, the plaintiffs failed to show a causal connection between a particular defendant's conduct and the suppression of the plaintiff's speech. *Id.* at 61–68, 76. For

4

example, some plaintiffs failed to show any government contacts at all with the platform they used. *Id*. at 63 ("[T]here is no record evidence that White House officials ever communicated at all with LinkedIn."). Some could not trace their claimed injuries to any defendant, relying instead on communications from *other* government agencies not part of the case. *Id.* ("Those entities are not before us."). In other instances, plaintiff's claims that an agency allegedly targeted certain content had no connection to the content of plaintiff's removed speech. *See id.* at 64 ("[T]he record contains no evidence that either the FBI or CISA engaged with the platforms about the pandemic."). And in many instances, "the timing" did not "line up." *Id.* at 63 (government's contact occurred after the platform had already restricted plaintiff's speech).[2]

Here, unlike in *Murthy*, the fact pattern is simple and causation easy to trace. DOJ and DHS officials repeatedly threatened criminal consequences for anyone engaged in online speech about the location of ICE activities, including developing ICE-related apps or even reporting on such apps. *See* Pls.' Br. at 4–5. There is no dispute that DOJ officials directly contacted Apple and Facebook about taking down ICE-related apps and Rosado's Facebook group. It is likewise undisputed that the platforms immediately removed the Eyes Up app and Rosado's group. Quite the opposite of *Murthy*, in this case there is a simple through line of facts showing traceability.

The *Murthy* Court not only declined to impose new or heightened standing requirements, 603 U.S. at 68 n.8, it left undisturbed the standing analysis in *Bantam Books*. There, the Court not only held standing existed under ordinary principles, but further noted First Amendment violations

---

[2] The two other cases the government cites, Opp'n at 9–10, failed for similar fact-specific reasons. *See Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 497–98 (6th Cir. 2023) (Twitter users failed to show standing to pursue government agencies because Twitter had been removing COVID-19 misinformation long before the challenged government conduct); *Hart v. Facebook, Inc.*, 2024 WL 1693355, at *3 (9th Cir. Apr. 9, 2024) (plaintiff lacked standing when he could point to no interactions between platforms and officials about his COVID-related posts).

5

"may too often go unremedied" if only intermediaries could sue, because they have fewer incentives to do so. *Bantam Books*, 372 U.S. at 64 n.6; *see also Vullo*, 602 U.S. at 197–98 (noting same incentives). This Court should thus reject the government's "extreme position [that] would eviscerate the courts' ability to redress government conduct that deliberately sought to chill speech by pressuring third parties." *Am. Ass'n of Univ. Professors v. Trump*, 2025 WL 3187762, at *17–18 (N.D. Cal. Nov. 14, 2025) (rejecting government's *Murthy* argument when First Amendment harms were the "predictable effect" of government jawboning).

> **C.**      **The evidence shows that Apple and Facebook did not apply their own policies independent of government pressure.**

In arguing against traceability, the government again turns to *Murthy* to contend plaintiffs must show Facebook and Apple did not make "content-moderation decisions of their own accord under their existing policies." Opp'n at 9. And once again, *Murthy* is distinguishable. There, social media platforms had for years "targeted speech they judge[d] to be false or misleading," including "misleading claims about elections" and "health-related misinformation," *Murthy*, 603 U.S. at 50, and had done so "long before any of the Government defendants engaged in the challenged conduct." *Id.* at 60. That undercut the *Murthy* plaintiffs' efforts to show the platforms acted because of government pressure rather than on their own independent judgment. *Id.* at 61–62.

Here, the unrebutted record is quite the opposite. The government cites no prior history of Facebook or Apple removing apps and groups reporting on ICE activity. Facebook and Apple did not suppress them until *after* DOJ and DHS officials demanded that the platforms do so. They had been aware of the Eyes Up app and the Chicagoland group and never said they violated the platforms' respective policies—not until the government stepped in.

Take Facebook. Before the government's demands, Facebook had regularly reviewed Rosado's group and repeatedly affirmed the group *was* in compliance with Facebook's policies.

Facebook's moderators had only ever removed only five user posts in the group (among tens of thousands), none created or approved by Rosado or her moderators. Verified Compl. ("Compl.") ¶ 70. When its moderators removed the five posts, Facebook told Rosado these were "participant violations" that "don't hurt your group," even reiterating: "Groups aren't penalized when members or visitors break rules without admin approval." *Id.* ¶¶ 26, 32–33; Rosado Decl. Ex. C6. That was consistent with Facebook's policies, which call for removing groups only when the *group moderator* repeatedly creates or approves such content. McDonell Decl. Ex. MM. When Facebook independently applied its own policies, it allowed Rosado's group to stay for almost nine months—up until the government made its demands. Compl. ¶ 66. That Facebook complied within a day makes causation "obvious." *Backpage.com*, 807 F.3d at 233.

Facebook's public statements further confirm it acted because of the government's intervention. When a reporter sought confirmation that the DOJ asked Facebook to take down the Chicagoland Group, a Facebook spokesperson pointed to Attorney General Bondi's statement (which confirmed as much) and otherwise declined to comment on the question. *See* McDonell Decl. Ex. OO (spokesperson statement); *id.* Ex. KK (Bondi statement).

As for Eyes Up, Apple had thoroughly reviewed the app and its content (which was already hosted on a publicly available website) before approving the app for inclusion in the App Store. Compl. ¶¶ 39, 58. Eyes Up remained on the App Store for five weeks without incident or any concerns. Apple had no problem with the app until government officials told the company to take it down, and Apple complied within a day. Compl. ¶ 51.[3]

---

[3] To the extent the government tries to imply Apple took down Eyes Up because of an earlier shooting in Dallas, Texas, Opp'n at 10, the argument lacks any evidentiary or logical support. On September 24, 2025, a man opened fire on an ICE field office in Dallas Texas, killing three detainees. FBI Director Kash Patel alleged that *a month earlier* the shooter had "searched apps that tracked the presence of ICE agents." FBI Director Kash Patel (@FBIDirectorKash), X (Sept.

Apple itself confirmed the government played a role in the takedown, saying it removed Eyes Up based on "[i]nformation provided to Apple by law enforcement." Hodges Decl. Ex. B; *accord* McDonell Decl. Ex. BB (Apple publicly stating it removed ICEBlock and "similar apps" because of "information we've received from law enforcement"). Admittedly, Apple's *post hoc* justification pointed to guideline 1.1.1, which prohibits "Defamatory, discriminatory, or mean-spirited content," such as references to "religion, race, sexual orientation, gender, national/ethnic origin, or other targeted groups." Hodges Decl. Ex. B. But Apple had never flagged any problem under that guideline when it reviewed and approved the app just five weeks earlier. Indeed, Apple had almost never enforced guideline 1.1.1. *See* McDonell Decl. Exs. GG–II (showing that from 2022 to 2024, Apple removed zero to four U.S.-based apps per year under guideline 1.1.1).

It is not surprising that platforms targeted by government coercion cite their policies in *post hoc* explanations. As the Seventh Circuit noted, an intermediary "will be reluctant to acknowledge [it] is submitting to threats" and will often cite some other reason. *See Backpage.com*, 807 F.3d at 233, 237. Intermediaries like Facebook and Apple have no incentive to buck the government, as their priority is to get out of the government's sights and on with business.

For purposes of standing, what's most notable is that Apple and Facebook attribute the takedowns, at least in part, to government outreach. *Compare* McDonell Decl. Exs. BB, OO, *with Murthy*, 603 U.S. at 68 n.8 (noting lack of evidence that government was responsible, "even in part," for suppression of plaintiff's speech). Rather than support the government's position,

---

25, 2025, at 10:03 AM), https://x.com/FBIDirectorKash/status/1971213954123751822. The government never showed any such tools actually caused or contributed to the shooting. And that would make no sense in any event. One doesn't need an app to know ICE officers will be present at an ICE office. Nor does the government offer any evidence that Apple knew about the shooting, much less that it had anything to do with Apple's takedown of Eyes Up on October 3, the day after DOJ contacted Apple.

Apple's and Facebook's statements confirming government involvement bolster causation and traceability. *Cf. Backpage.com*, 807 F.3d at 232 (concluding Visa's admission that it acted after speaking with the sheriff's office was more significant than Visa's claim it did not feel threatened).

**D.      The government's threats and demands hang over Apple and Facebook.**

Contrary to the government's arguments, Opp'n at 11–13, plaintiffs have standing to seek prospective injunctive relief because the government's coercion is having "continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Plaintiffs' speech remains suppressed—Eyes Up remains unavailable on the App Store, and the Chicagoland group (including all of the content posted to it) remains inaccessible to group members and the public.[4] And the threats of adverse consequences continue to hang over Apple and Facebook.

As previously discussed, removal of the app and group traces to DOJ and DHS officials' threats and demands, and such "traceability for past harms … can serve as evidence of expected future harm." *Murthy*, 603 U.S. at 70; *see also Brown v. Kemp*, 86 F.4th 745, 769 (7th Cir. 2023) (a "history of attempted prosecutions" of plaintiffs supported standing for prospective injunction). DOJ and DHS officials have consistently maintained that speech reporting on ICE activities is unlawful and can be prosecuted, they repeatedly made such threats, and they repeatedly coerced tech companies to remove such speech. Apple and Facebook surely understand that DOJ and DHS expect their continued compliance. Bondi made that clear in remarks the week after the removal of Eyes Up, ICEBlock, and other ICE-related apps, commenting not only that DOJ "had" Apple remove apps, but adding: "Hope they *continue to comply* with that." McDonell Decl. Ex. CC, at 0:13 (emphasis added); *see also id.* Ex. KK (Bondi warning after takedown of Chicagoland group

---

[4] Contrary to the government's argument, the ongoing suppression of this group creates standing, regardless of Rosado's creation of a different group with more restricted content and half the members. *See* Opp'n at 12–13; Compl. ¶¶ 73–74. The government does not get a pass to suppress some of Rosado's online speech simply because it hasn't suppressed all of it.

that DOJ "will continue engaging tech companies to eliminate platforms"); *id.* Ex. LL (in Noem's post on the takedown, further threatening "We will prosecute … to the fullest extent of the law").

DOJ and DHS officials have not backtracked or given any indication their position has changed. *See Chiles v. Salazar*, 2026 WL 872307, at \*5 n\* (U.S. Mar. 31, 2026) (standing existed when government "declined to disavow enforcement" of challenged law); *Brown*, 86 F.4th at 769 (same). To the contrary, in a statement about this lawsuit in February 2026, a DHS spokesperson made clear the government's position is unchanged, alleging ICE-related apps "interfere with law enforcement activities and harbor illegal aliens, both of which are also separately illegal."[5] The government's position, its threats, and its demands continue to hang over Apple and Facebook.

On this record, the government defies logic when it suggests the coercion of Apple and Facebook somehow disappears unless government officials regularly remind the companies not to reinstate plaintiffs' speech. Opp'n at 12. Does the government contend that threats of criminal prosecution from the nation's top law enforcement officers simply expire in a matter of months? No such requirement exists. *See, e.g.*, *Backpage.com*, 807 F.3d at 239 (granting injunction five months after threatening letter from sheriff to intermediaries).

Here again, the government turns to *Murthy* and again misreads the case. Contrary to the government's argument, *Murthy* did not create a new rule of standing for injunctive relief requiring proof of an "ongoing pressure campaign." Opp'n at 11. The Supreme Court in *Murthy* affirmed the general standard that a prospective injunction requires a "substantial risk" of a "future … injury" that satisfies traceability and redressability, *Murthy*, 603 U.S. at 49–50, and it did not

---

[5] Cate Charron, *Lawsuit: Bondi, Noem coerced Apple to remove Indiana man's ICE monitoring app*, INDIANAPOLIS STAR (Feb. 11, 2026), https://www.indystar.com/story/news/politics/2026/02/11/bondi-noem-coerced-apple-to-remove-ice-monitoring-app-indiana-man-lawsuit/88623136007/.

dictate only one way to satisfy that standard. Indeed, unlawful government coercion need not involve a "campaign" at all; government actions to pressure intermediaries to censor speech may be one or many, but the constitutional prohibition is the same. *See, e.g.*, *Backpage.com*, 807 F.3d at 239 (enjoining sheriff's coercion primarily consisting of a single letter); *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (improper coercion consisted of city official's one letter conveying an "implicit threat"). Rather, in *Murthy*, the plaintiffs alleged they endured a "campaign" of censorship from government interactions with social media companies, 603 U.S. at 63, and their argument for a prospective injunction rested on an allegation that "the government continues to communicate with the platforms about content-moderation issues," *id.* at 69 (cleaned up). And on the plaintiffs' proffered theory of standing, the *Murthy* Court concluded they had failed to show that the alleged "pressure campaign" was "ongoing." *Id.*

In *Murthy*, the plaintiffs could not establish even that the platforms' *past* moderation actions were traceable to government interference, leaving plaintiffs "particularly ill suited" to claim an injunction would redress injuries going forward. *Id.* at 70. Further, by the time the Supreme Court decided *Murthy* in summer 2024, circumstances had changed markedly. The COVID-19 pandemic had receded, and the government had largely already wound down communications with platforms about COVID misinformation, including by "disband[ing]" the team responsible for most of the challenged communications. *Id.* at 74 & n.11. Similarly, the government's forwarding reports of election-related misinformation to platforms for the 2020 and 2022 elections had ended, and it "represented that it will not resume operations for the 2024 election." *Id.* at 70; *see also id.* at 53. On that record, the *Murthy* plaintiffs failed to establish a likelihood the platforms would face government pressure about moderation decisions going forward. *Id.* at 73; *see also id.* at 58 (emphasizing decision based "[o]n this record").

11

The record here shows the opposite. The underlying circumstances have not changed. ICE raids continue, as does the public's interest in sharing information about ICE activities. The government's position on shutting down online forums and apps sharing such information has not changed. Far from disavowing its threats or abandoning its pressure tactics, the government has doubled down on its position that involvement in speech reporting on ICE activities is grounds for criminal prosecution. *See, e.g.*, McDonell Decl. Ex. CC, at 0:13; *id.* Exs. KK, LL; Charron, *supra* note 5. On this record, Apple and Facebook will reasonably understand the government's message that they must continue suppressing the Eyes Up app and the Chicagoland Facebook group.

## II.     Plaintiffs are likely to succeed on their First Amendment claims.

As detailed in plaintiffs' opening brief, DOJ and DHS officials demanded that Apple and Facebook censor speech—after repeatedly threatening criminal consequences for anyone associated with online tools reporting ICE activity—and then boasted the platforms had complied. Pls.' Br. at 9–14. Plaintiffs are likely to succeed on this unrebutted record. The officials' conduct, "viewed in context, could be reasonably understood to convey a threat of adverse government action" against Apple and Facebook to "suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. The government's arguments, based on fundamental misreadings of *Vullo*, fail to show otherwise.

The government incorrectly argues that *Vullo* "requires" applying a set list of factors to determine whether government conduct was coercive. Opp'n at 6, 13. *Vullo* requires no such thing. To the contrary, the Supreme Court made clear it did not adopt any set of factors, describing them as "just helpful guideposts" that some lower courts "have considered." *Vullo*, 602 U.S. at 189–91; *see also id.* at 199 (Gorsuch, J., concurring) (noting guideposts may at times be "useful," and "sometimes they might not," but they are "just" guideposts and "nothing more"). The Court instead decided *Vullo* based on whether the facts "as a whole" showed government officials acted to "coerce private parties in order to punish views that the government disfavors." *Id.* at 180, 194.

12

The government thus errs when it insists plaintiffs must identify precisely what government officials said in private communications with Apple and Facebook. Opp'n at 14, 18. The entire course of conduct, viewed in context, is what matters. *Vullo*, 602 U.S. at 191. The government violates the First Amendment even without "specific, personalized communication directed at an individual third party," as "courts have also found unconstitutional coercion when the threat is addressed to the public more broadly," such as via executive order. *CAIR-Foundation, Inc. v. Desantis*, 2026 WL 613468, at *6 (N.D. Fla. Mar. 4, 2026) (citing *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 153 (D.D.C. 2025)). The same goes for other kinds of public-facing or broadly distributed statements, like press releases and guidance letters. *See, e.g.*, *Vullo*, 602 U.S. at 183–85, 194–95.

Here, it is undisputed that DOJ officials *did* reach out directly to Apple and Facebook. And there is no need to guess whether they were coercive communications—one can simply look to Bondi's, Noem's, and other officials' contemporaneous descriptions of the "demands" and "orders" the government issued to Apple and Facebook. *See* Pls.' Br. at 11 (citing McDonell Decl. Exs. BB–EE, LL). The Court should take defendants at their word on this point.

The government never denies these conversations occurred or that they involved demands and orders. If the contents of the conversations somehow reflect that they were *not* coercive— contrary to defendants' own statements and other supporting evidence—the government could have offered such evidence. That it declined to do so is telling. In any event, when you have a confession and ample corroborating evidence, nothing in *Vullo* (or any broader evidentiary principle) requires having contemporaneous recordings of the unlawful conduct to boot.

The government further errs by suggesting facts should be parsed and viewed in isolation (*e.g.*, asserting that a particular government statement is not coercive by itself, *see* Opp'n at 15–

13

18), when the inquiry is whether government conduct, viewed in context, is coercive "as a whole." *Vullo*, 602 U.S. at 194–95 (noting the Second Circuit erred with its piecemeal approach of viewing allegations "in isolation"); *see also id.* at 199 (Gorsuch, J., concurring). For example, the government attempts to simply write off the entirety of DOJ and DHS officials' threats to prosecute anyone affiliated with online tools documenting ICE activity—from the developer of one such app, to even CNN for just *reporting* on an app, *see* Pls.' Br. at 4–5, 12—because those threats happened to concern ICEBlock. But this misunderstands how coercion works. Widely broadcast threats can coerce even if nominally about a different target, or no specific target at all. *See, e.g.*, *CAIR-Foundation, Inc.*, 2026 WL 613468, at *6. These threats cannot be viewed in isolation, as they set the stage for the government's direct outreach to Apple a short time later.

Moreover, notwithstanding that Bondi's October 2 posts about demands to Apple specifically mentioned ICEBlock, the evidence shows the government's demands were not so limited. First, Apple took down Eyes Up, ICEBlock, and other similar apps immediately after DOJ's outreach. Compl. ¶ 51. Second, Apple stated it took down these various apps for the same reason: "information" from "law enforcement." *Id.* ¶ 56. Third, Bondi used the term "ICEBlock" to refer to this category of apps, as evidenced by her subsequent remarks about DOJ's role in removing "ICEBlock *apps*," plural. McDonell Decl. Ex. CC, at 0:09 (emphasis added). Fourth, per a DOJ source, DOJ had also ordered Apple to remove Red Dot, one of the other apps taken down at the same time as Eyes Up and ICEBlock. *See id.* Ex. DD; *see also id.* Ex. EE (discussing DOJ source).[6] At the very least, this evidence shows the government engaged in conduct that Apple

---

[6] The government attempts to write off Laura Loomer's reports from DOJ sources as hearsay, Opp'n at 17–18, but courts may consider hearsay at the preliminary-injunction stage. *Federal Trade Comm'n v. Lifewatch, Inc.*, 176 F. Supp. 3d 757, 762 (N.D. Ill. 2016) (citing *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991)). And Loomer's statements are corroborated by other

"reasonably understood" to threaten consequences if it did not take down *all* such apps, including Eyes Up, which is the ultimate inquiry here. *Vullo*, 602 U.S. at 191.

Finally, the government attempts to disregard the import of DOJ and DHS officials' demands to remove ICE-related apps with puzzling arguments about timing. For instance, when addressing Bondi's and Noem's public admissions about demanding removal of the Chicagoland Facebook group, the government offers that these statements were not coercive "because they were published *after* Facebook removed Rosado's group." Opp'n at 15. Well, of course they were published after the removal—statements describing past events (here the governments' demands and Facebook's compliance) necessarily occur after those events. The government also contends Kreisau Group cannot rely on Bondi's June 30, 2025 public statements condemning ICEBlock and ICE tracking apps generally because they came *before* Eyes Up was available in the App Store, Opp'n at 16. But those threats set the stage for when DOJ contacted Apple about removing ICE-related apps on October 2, 2025, and Apple immediately complied.

## CONCLUSION

The unrebutted record in this case amply shows the government coerced Facebook and Apple to take down Eyes Up and the Chicagoland group. That the platforms complied so quickly shows they got the message, appreciating the powers federal agencies and prosecutors can wield. The result is an unconstitutional prior restraint indirectly imposed by the government that should be enjoined under *Bantam Books*, *Vullo*, and *Backpage.com*. Plaintiffs therefore respectfully request that the Court grant their motion for a preliminary injunction.

---

evidence. For example, she posted that DOJ had contacted Facebook about the Chicagoland group on October 13, the day before Bondi made that outreach public. McDonell Decl. Exs. EE, KK.

Dated: April 6, 2026

Respectfully Submitted,

/s/ *Colin P. McDonell*
Colin P. McDonell
James C. Grant (admitted pro hac vice)
Hannah M. Abbott (admitted pro hac vice)
Cary Davis (admitted pro hac vice)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
colin.mcdonell@fire.org
jim.grant@fire.org
hannah.abbott@fire.org
cary.davis@fire.org

*Counsel for Plaintiffs*

16